## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

ANDERSON JESUS URQUILLA-RAMOS,

                Petitioner,

v.                                  CIVIL ACTION NO.  2:26-cv-00066

DONALD J. TRUMP, et al.,

                Respondents.

### MEMORANDUM OPINION AND ORDER

Antiseptic judicial rhetoric cannot do justice to what is happening. Across the interior of the United States, agents of the federal government—masked, anonymous, armed with military weapons, operating from unmarked vehicles, acting without warrants of any kind—are seizing persons for civil immigration violations and imprisoning them without any semblance of due process. The systematic character of this practice and its deliberate elimination of every structural feature that distinguishes constitutional authority from raw force place it beyond the reach of ordinary legal description. It is an assault on the constitutional order. It is what the Fourth Amendment was written to prevent. It is what the Due Process Clause of the Fifth Amendment forbids.

The Petition for Writ of Habeas Corpus filed by Petitioner Anderson Jesus Urquilla-Ramos, [ECF Nos. 1, 26], brings just that circumstance before this court as a discrete case and controversy. This court will decide it as such. But I will not pretend, through careful procedural language, that what is at issue here is a technical question of statutory interpretation. The overarching issue is whether the federal government may deploy anonymous agents to seize persons on American

streets and highways for civil violations, without warrants, without identification, and without any process before or after. The Constitution does not permit that. The remainder of this opinion explains why.

In our constitutional republic, governmental force derives its authority from the Constitution. But that authority is not unlimited. The Government's power is legitimate only because it is derived from the People and exercised through law by identifiable public officers answerable to the public and to the courts. The structure of the Constitution guarantees visibility. Both the officer and the force he employs are traceable to authority delegated by the People and subject to the limits imposed by law. When the Government uses force against the public, the citizen can recognize the officer as a lawful representative. The public can evaluate the act. The judiciary can later review it. Every stop, arrest, detention, and use of force can be tested against the Constitution's protections. Not so here.

For these reasons and the reasons that follow, Petitioner's Amended Verified Petition for Writ of Habeas Corpus ("Petition"), **[ECF No. 26],** is **GRANTED**. The court **FINDS** that both his Fourth Amendment right to be free from unreasonable searches and seizures as well as his Fifth Amendment right to due process have been violated. Immediate release is the only relief sufficient to remedy Petitioner's unlawful detention.

## I.    BACKGROUND[1]

On January 7, 2026, Petitioner, a 21-year-old national of El Salvador, was "arrested, abruptly and without warning by a group of masked men purporting to be" Immigration and Customs Enforcement ("ICE") officers. [ECF No. 1, ¶¶ 1–2]. Petitioner was eventually detained at South Central Regional Jail ("SCRJ") in Charleston, West Virginia. *Id.* ¶¶ 3, 5, 28.

According to the Petition, the Petitioner had not broken any traffic laws, but an officer pulled him over. [ECF No. 1, ¶ 25]. When the Petitioner asked why he had been pulled over, he was told by the officer that there was a plastic cover on the license plate of the vehicle. *Id.* Since being detained, he has yet to be cited or charged for a traffic citation. *Id.*

On January 28, 2026, Petitioner filed a Petition[2] for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. *Id.* ¶¶ 1, 7. At the time of the Petition, Petitioner was at SCRJ within the Southern District of West Virginia. *Id.* The following day, January 29, 2026, the court stayed any removal proceeding that would take Petitioner out of the district, set a briefing schedule, and scheduled a show cause hearing for February 5, 2026. [ECF No. 3].

But on February 2, 2026, the Government notified the court that Petitioner was no longer in the district. [ECF No. 8]. Instead, the Government said that Petitioner was in Texas, and later

---

[1] The parties do not dispute the facts as I present them here. The Government offers only a few immigration forms attached to its response, [ECF Nos. 10-2 to 10-5]. Yet, its argument in support of continued detention is premised entirely on legal theories rejected by this court and at least three other judges in this district. *Aroca v. Mason*, --- F. Supp. 3d ---, 2026 WL 357872, at *7–17 (S.D. W. Va. Feb. 9, 2026) (Goodwin, J.); *Solano v. Mason*, No. 2:26-cv-00045, --- F. Supp. 3d ---, 2026 WL 311624 (S.D. W. Va. Feb. 4, 2026) (Johnston, J.); *Gonzalez v. Aldridge*, No. 3:26-cv-00055, 2026 WL 313476 (S.D. W. Va. Feb. 5, 2026) (Chambers, J.); *Umarov v. Mason*, No. 2:26-cv-00081, 2026 WL 381614 (S.D. W. Va. Feb. 11, 2026) (Berger, J.) Just as in other cases, the Government has offered no information about the nature of the stop, arrest, and detention of the Petitioner, nor did the Government offer any additional evidence at the show cause hearing on February 19, 2026.

[2] The Petition identifies Christopher Mason, Superintendent of SCRJ ("State Respondent"), as a respondent, as well as Donald J. Trump, President of the United States; Brian McShane, Field Office Director of the Philadelphia Field Office of ICE; Todd Lyons, Acting Director of ICE; Kristi Noem, Secretary of Homeland Security; and Pamela Bondi, the United States Attorney General (collectively, the "Government"). The Amended Verified Petition is identical to the originally filed Petition. [ECF No. 26]. For clarity, the court will simply refer to the Petition.

counsel confirmed that the Petitioner was transferred to Washington state after being in Texas. [ECF No. 17]. The court did not find that the Government had willfully ignored the January 29 order, but the court did order the Petitioner's return to the district and reset the hearing on the Petition. [ECF No. 21]. On February 12, 2026, the Government notified the court that the Petitioner had been returned to the district. [ECF No. 22].

Petitioner asks the court to order Respondents to immediately release him and declare that Petitioner's arrest and detention was unlawful. [ECF No. 1, at 10–11]. This is, at least in part, because Petitioner alleges that his presence in the United States is lawful, and he has a pending asylum case, a work permit, and a valid driver's license. *Id.* ¶¶ 3, 22–23, 31.

Nonetheless, Petitioner was allegedly stopped for a traffic violation. *Id.* ¶ 25. Abruptly, as it is described in the Petition, he was arrested by "a group of masked men" who got out of an "unmarked black Ford Explorer without even a license plate." *Id.* ¶ 2. The stop, arrest, and detention, Petitioner alleges, violate multiple constitutional, statutory, and regulatory protections, including the Fourth and Fifth Amendments, the Immigration and Nationality Act ("INA") and its implementing regulations, and the Administrative Procedure Act ("APA"). *Id.* ¶¶ 29–55.

On February 2, 2026, the Government responded to the Petition and moved for dismissal based on several legal theories, most of which have already been rejected by four judges in this district. [ECF No. 10]. On February 19, 2026, the court convened for a show cause hearing. [ECF No. 27]. Counsel for the State Respondent, counsel for the Government, and counsel for the Petitioner were present. The Petitioner was also present.

At the show cause hearing, counsel presented opening statements to the court. Petitioner's counsel offered arguments identical to those in his brief. The Government relied on its brief and did not offer further argument. In response to the court, the Government conceded that it did not

dispute the factual allegations as alleged in the Petition. The court granted the Petition on the record with this Memorandum Opinion and Order to follow.

## II.    LEGAL STANDARD

"[H]abeas corpus is a broad, independent writ designed to address challenges to any illegal custody," *Wall v. Kiser*, 21 F.4th 266, 273 (4th Cir. 2021), including those "by executive direction," *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). The "heart of habeas corpus" is the challenge to a petitioner's confinement (or the duration of his confinement), where he seeks "immediate release or a speedier release from that confinement." *Preiser*, 411 U.S. at 498. The Constitution guarantees that the writ of habeas corpus is "available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004). Accordingly, noncitizens may invoke habeas in immigration-related matters where no other statutory mechanism for review is provided. *See Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001). Indeed, challenges to present immigration confinement "fall within the 'core' of the writ of habeas corpus." *Trump v. J. G. G.*, 604 U.S. 670, 672 (2025) (quoting *Nance v. Ward*, 597 U.S. 159, 167 (2022))

28 U.S.C. § 2241 confers on federal district courts "within their respective jurisdictions" the authority to hear applications for habeas corpus by any person who claims to be held "in custody in violation of the Constitution or laws or treaties of the United States . . . ." *Id.* §§ 2241(a), (c). After receiving the petition and any response thereto, "[t]he court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243. The petitioner bears the burden of proving that he is being held contrary to law by a preponderance of the evidence. *Walker v. Johnston*, 312 U.S. 275, 286 (1941) ("On a hearing, [the § 2241 petitioner has] the burden of sustaining his allegations by a preponderance of evidence."); *Parke v. Raley*, 506 U.S. 20, 31 (1992); *Sumner v. Mata*, 449 U.S. 539, 551 (1981).

"The touchstone of the Fourth Amendment is reasonableness . . . ." *United States v. Knights*, 534 U.S. 112, 118 (2001). This is "generally assessed by carefully weighing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *County of Los Angeles v. Mendez*, 581 U.S. 420, 427 (2017) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Overall, reasonableness is an objective inquiry that "is evaluated by looking at the 'totality of the circumstances.'" *Case v. Montana*, 607 U.S. ---, 146 S. Ct. 500, 508 (2026) (first quoting *Barnes v. Felix*, 605 U.S. 73, 80 (2025); and then quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

The Fifth Amendment guarantees a different constitutional protection: due process. The Fifth Amendment states that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. The Supreme Court has emphasized that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979). Further, "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."[3] *Zadvydas*, 533 U.S. at 693.

## III.    DISCUSSION

Petitioner alleges that his rights under both the Fourth and Fifth Amendments have been violated. I agree. Petitioner was arrested by unidentifiable, masked officers acting without a

---

[3] Although Congress's power over immigration policy has been described as "plenary," *see Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972), "it is well-established that the Due Process Clause stands as a significant constraint on the manner in which the political branches may exercise their plenary authority." *Hernandez v. Sessions*, 872 F.3d 976, 990 n.17 (9th Cir. 2017) (citing *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001)).

warrant, without articulable justification for concealing their identities, and with no mechanism by which he could identify those seizing him or meaningfully test the legality of their asserted authority. In the absence of a warrant, individualized justification, or any means of contemporaneous attribution of the seizure to particular officers, the deployment of masked and anonymous agents to execute a civil arrest strips the seizure of the accountability the Fourth Amendment presupposes and renders it unreasonable.

Separately, Petitioner entered the United States as an unaccompanied minor and was placed under the care of the United States Department of Health and Human Services, through its Office of Refugee Resettlement. He was released from custody into the United States, where he maintains a pending asylum application, lawful work authorization, and a valid driver's license. The Government's mandatory detention of him is unlawful under the Fifth Amendment's Due Process Clause and applicable statutory provisions. For these reasons, which I address in turn below, the Petition is **GRANTED**.

### A.  Jurisdiction

As a threshold matter, I conclude the court has jurisdiction over the Petition. As in prior cases before this court,[4] the Government argues that this court lacks jurisdiction under 8 U.S.C. §§ 1252(b)(9) and 1252(g). I disagree. Section 1252(b)(9) applies only "[w]ith respect to review of an order of removal." *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 697 (4th Cir. 2019); *see also Jennings v. Rodriguez*, 583 U.S. 281, 293–95 (2018) (plurality opinion).[5]

---

[4] *Aroca,* 2026 WL 357872, at *11 (Goodwin, J.); *Larrazabal-Gonzalez v. Mason*, --- F. Supp. 3d. ---, 2026 WL 221706, at *3 n.6 (S.D. W. Va. Jan. 28, 2026) (Goodwin, J.); *Flores v. Mason,* No. 2:26-cv-00044, 2026 WL 227010, at *3 n.5 (S.D. W. Va. Jan. 28, 2026) (Goodwin, J.).

[5] The holding of a case in which there was no majority opinion "'may be viewed as th[e] position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). In *Jennings v. Rodriguez*, the petitioner, a lawful permanent resident who had been convicted of a felony, was detained under 8 U.S.C. § 1226 during removal proceedings and filed a habeas petition seeking a bond hearing. 583 U.S. at 289–90. Amongst other issues, the Court

Here, Petitioner is not challenging an order of removal or a removability determination. Petitioner is instead challenging the manner of his seizure and separately his continued detention.

Section 1252(g) similarly does not strip jurisdiction over Petitioner's claims. That provision bars review only of the Attorney General's decisions to "commence proceedings, adjudicate cases, or execute removal orders." *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 482 (1999) (quoting 8 U.S.C. § 1252(g)). It is aimed at protecting prosecutorial discretion, not at foreclosing challenges to detention itself. *Jennings*, 583 U.S. at 293–95; *AADC*, 525 U.S. at 485 n.9. Petitioner does not contest the commencement, adjudication, or execution of removal proceedings, but instead challenges the lawfulness of his continued detention and the manner in which he was seized.

### B.  The Fourth Amendment

Having determined this court has jurisdiction over the Petition, I now turn to the lawfulness of Petitioner's arrest under the Fourth Amendment. A challenge to one's confinement necessarily implicates the legality of the process that led to the individual's detention. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Under the Fourth Amendment, the initial seizure of a person—even to effectuate detention under immigration law—must be reasonable.

---

was asked to address whether 8 U.S.C. § 1252(b)(9) stripped it of jurisdiction over the habeas challenge. 583 U.S. at 291–92. "[A] majority of the Court" concluded it "ha[d] jurisdiction." *Id.* at 314 (Thomas, J., concurring). The dissenting justices concluded that § 1252(b)(9) "applies only 'with respect to review of an order of removal under § 1252(a)(1).'" *Id.* at 355 (Breyer, J., dissenting) (citation modified). The three-justice plurality took a narrower view, holding because the respondents were not asking for "review of an order of removal," "challenging the decision to detain" them "in the first place or to seek removal," or "challenging any part of the process by which their removability will be determined," the jurisdiction bar did not apply. *Id.* at 294 (plurality opinion). Under *Marks*, the plurality's narrower rationale controls. 430 U.S. at 193.

Petitioner was driving through West Virginia when he was stopped by an unmarked vehicle, despite having violated no traffic laws. The officer cited only a plastic cover on his license plate as the reason for the stop.[6] As Petitioner waited, additional unmarked vehicles converged on the scene. Despite presenting his duly issued driver's license and an employment authorization document issued by U.S. immigration authorities, he was ordered out of the vehicle and handcuffed by masked individuals without any explanation. He was taken into custody by masked, unknown federal agents, leaving him unable to identify those seizing him. I conclude that the use of masked agents to effect a civil immigration detention under these circumstances is unreasonable and unconstitutional. As a result, Petitioner's Fourth Amendment rights were unquestionably violated.

In reaching this conclusion, I consider the court's responsibility to interpret the Constitution, the philosophical foundation of our system of self-governance, the historical context of immigration enforcement, the historical context of the Fourth Amendment, the personal security the Amendment guarantees, the meaning of a "reasonable" search and seizure, and the Government's asserted interests in permitting masked law enforcement. I take each in turn.

### 1. The Court's Responsibility to the Constitution

I begin with a foundational observation. Article III vests the judicial power of the United States in this court no less than in any other federal court, to be exercised in those cases properly before it. U.S. Const. art. III, §§ 1–2. The power to decide cases includes the duty to interpret and apply the Constitution. A district court does not sit as a way station awaiting instruction from above. When a case presents a constitutional question, the court must answer it.

---

[6] "Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so as to prevent the plate from swinging and at a height of not less than twelve inches from the ground, measuring from the bottom of the plate, in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible." W. Va. Code. § 17A-3-15(b).

Our legal culture has developed a strange timidity about constitutional interpretation. We often act as if constitutional meaning emerges only from the Supreme Court, as if district courts merely wait for appellate instruction before interpreting constitutional text. That approach inverts the Constitution. In arguments everywhere, lawyers reach for perfect case analogies and factual alignment as if the Constitution itself were somehow inaccessible. But the Constitution is not a compilation of case holdings. It is a text with meaning that existed before any court construed it, and it continues to bind government conduct whether or not a prior case has addressed the specific facts at hand.

To be sure, precedent matters profoundly. When the Supreme Court or the Fourth Circuit has resolved a question, this court follows that resolution. When prior cases illuminate related questions, the court learns from them carefully. Precedent provides predictability, constrains arbitrary interpretation, reflects accumulated judgment, and promotes equal treatment. But it cannot replace the Constitution. When precedent directly resolves the question before me, that ends the inquiry. When prior cases provide clear guidance, I follow it. But when existing cases address different facts, different contexts, and different questions, the Constitution still applies. And the court must determine what it means through disciplined interpretation, not serial citation.

This is especially true when the government employs practices so recent that doctrine has not yet addressed them. The absence of a case holding that warrantless, non-exigent, anonymous civil seizures in the interior of the United States violate the Fourth Amendment does not mean the Constitution permits them. It means the practice is new enough, and brazen enough, that no court has yet been required to state the obvious. This court is now required to say it.

### 2.  The Philosophical Foundation: "We the People"

The deepest objection to anonymous government force is not procedural. It runs to the very nature of legitimate government itself and underlies the Fourth Amendment analysis that follows.

In a government of "We the People," every exercise of coercive power is a delegated act. U.S. Const. Preamble; *see also* James Madison, *Federalist No. 49* (Feb. 2, 1788) ("[T]he people are the only legitimate fountain of power, and it is from them that the constitutional charter, under which the several branches of government hold their power, is derived."). The legitimacy of that delegation relies on the ability of the people to verify that the power is being used according to law. *See* Letter from Thomas Jefferson to Richard Price (Jan. 8, 1789) (on file with the Library of Congress) ("[W]herever the people are well informed they can be trusted with their own government; that whenever things get so far wrong as to attract their notice, they may be relied on to set them to rights."). As James Madison warned, "A popular Government without popular information or the means of acquiring it, is but a Prologue to a Farce or a Tragedy, or perhaps both." Letter from James Madison to W.T. Barry (Aug. 4, 1822) (on file with the Library of Congress).

Our government "of the people, by the people, [and] for the people . . . [,]" Abraham Lincoln, *The Gettysburg Address* (Nov. 19, 1863),[7] thus inherently requires basic democratic principles of transparency and accountability for the government's exercise of power over the people to be legitimate. *Inter-Cooperative Exch. v. U.S. Dep't of Com.*, 36 F.4th 905, 910 (9th Cir. 2022) (explaining "the importance of government transparency in 'maintaining a functional democratic polity, where the people have the information needed to check public corruption, hold government leaders accountable, and elect leaders who will carry out their preferred policies.'"

---

[7] Available at https://constitutioncenter.org/the-constitution/historic-document-library/detail/abraham-lincoln-the-gettysburg-address-1863?gad_source=1.

(quoting *Hamdan v. U.S. Dep't of Just.*, 797 F.3d 759, 769–70 (9th Cir. 2015))). The government is a limited one and accountable to the people who are the source of its authority. *See e.g., Marbury v. Madison*, 5 U.S. 137, 176 (1803).

When the state reaches out and takes hold of a human being and deprives him of his liberty, that act must present itself as the people's act. Not eventually. Not upon later inquiry. At the moment it occurs. The person seized is not merely a subject of government power. His liberty is being constrained by an authority that, in a republic, derives from his own consent and the consent of those like him. For that authority to be legitimate, it must be visible as authority at the moment it is asserted. The Supreme Court has explained that individuals knowing "what their Government is up to[,]" *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171 (2004) (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989) (cleaned up)), is "a structural necessity in a real democracy." *Id.* at 172. As Justice Brandeis explained, "Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." Louis D. Brandeis, *What Publicity Can Do*, Harper's Weekly, Dec. 20, 1913, at 10.

An anonymized federal police force for civil enforcement contradicts these principles. "Police wield coercive power on behalf of the state — detaining, searching, and using force under color of law — and constitutional legitimacy depends on those powers being exercised openly and traceably." Shawn E. Fields, *The Anonymous Officer*, 13 (2026) (publication forthcoming) (citing *West v. Atkins*, 487 U.S. 42 (1988)).[8] When masked, unidentifiable agents emerge from an unmarked vehicle and take hold of a person on an American highway, the seizure does not announce itself as the people's authority. It announces only power. The people's will is not expressed in it in any form the person seized, or any witness, can recognize. "Officer anonymity

---

[8] Shawn Fields, *The Anonymous Officer* (Jan. 26, 2026) (available at https://ssrn.com/abstract=6145266 or http://dx.doi.org/10.2139/ssrn.6145266).

undermines accountability structures that democratic public institutions are designed to maintain." *Id.* at 12–13.

When authority is no longer traceable, it is no longer a legitimate exercise on behalf of the people. The distinction between this scenario and one where a law enforcement officer acts undercover is that "the officers hide their identities not (primarily) to protect themselves from harm but to protect the secrecy and viability of the investigation" after which their identity is revealed. *Id.* at 8. Otherwise, stops without identification "must remain a rare exception, not the rule." *Doornbos v. City of Chicago*, 868 F.3d 572, 584 (7th Cir. 2017). And those rare instances must not be premised on anonymity for the mere sake of officer protection. If that were so, all officers across America might take to the streets in masks, but that would run contrary to the transparency and accountability our democracy demands.

In a system of checks and balances, the policy of officer anonymity violates the Constitution by evading accountability and judicial review. "The public nature of masked violence reinforces that it is both permissible and shielded from ordinary constraints of liberal democracy, including press scrutiny, civil suits, public identification, and reputation consequences." Fields, *The Anonymous Officer* at 29. This, the Constitution does not tolerate.[9] "Where there is no publicity, there is no justice. Publicity is the very soul of justice." Jeremy Bentham, The Works of Jeremy Bentham 355 (1843). Justice Scalia emphasized, transparent civic involvement is an act of "civic courage, without which democracy is doomed." *John Doe No. 1 v. Reed*, 561 U.S. 186, 228 (2010) (Scalia, J., concurring).

---

[9] "This does not resemble the Home of the Brave." *John Doe No. 1 v. Reed*, 561 U.S. 186, 228 (Scalia, J., concurring).

### 3.  Immigration Enforcement: Historical Context

The regulation of immigration has been a concern of the United States since the late eighteenth century.[10] In the 1790s, amidst fears of foreign influence and potential conflict with France, Congress enacted a series of preemptive measures to control the entry of immigrants.[11] These measures culminated in the Alien and Sedition Acts of 1798, which granted federal agents broad discretion to remove individuals deemed dangerous.[12]

Immigration enforcement underwent further institutional reform in 1933, when President Franklin D. Roosevelt issued Executive Order 6166, creating the Immigration and Naturalization Service ("INS").[13] The INS absorbed the immigration and deportation functions previously divided between the Bureau of Immigration and the Bureau of Naturalization. The INS remained the primary federal immigration agency until the early twenty-first century, when national security concerns prompted further restructuring. Following the September 11, 2001 terrorist attacks, President George W. Bush signed the Homeland Security Act of 2002, which dismantled the INS and established the Department of Homeland Security ("DHS").[14] Under DHS, the former INS duties were transferred to ICE, whose mission encompasses identifying and apprehending

---

[10] Joseph Summerill, *Immigration and Customs Enforcement Introduces "Friendly" Federal Detention Standards and New, Softer Detention Facilities*, 59-Sep Fed. Law. 46, 46 (2012).

[11] Kurt T. Lash & Alicia Harrison, *Minority Report: John Marshall and the Defense of the Alien and Sedition Acts*, 68 Ohio St. L.J. 435, 438 (2007).

[12] *Id.* The Alien and Sedition Acts illustrate the early exercise of expansive executive authority over immigration and the attendant risks to individual liberties. *Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J., concurring) (describing part of the Alien and Sedition Act as "one of the most notorious laws in our country's history . . . understood as a temporary war measure," and "widely condemned as unconstitutional by [James] Madison and many others.").

[13] Summerill, *supra* note 10, at 35.

[14] Jonathan Thessin, *Department of Homeland Security*, 40 Harv. J. On Legis. 513, 513 (2003)

undocumented immigrants as well as investigating funds, materials, or activities linked to terrorism or criminal conduct.[15]

The history of immigration in the United States reveals that "for reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews*, 426 U.S. at 8. Nevertheless, this discretion has consistently pushed constitutional boundaries, particularly in periods of heightened national concern. The Supreme Court has repeatedly emphasized that, despite DHS's broad authority, the agency remains bound by constitutional constraints and may act only through "constitutionally permissible means." *Zadvydas*, 533 U.S. at 695.

Today, ICE's operational practices raise new constitutional concerns.[16] While undercover operations in organized crime or anti-terrorism units may justify limited identity concealment,[17] routine immigration enforcement lacks such extraordinary circumstances. When the public cannot readily determine who is acting under government authority, it is difficult to regard the actions as legitimate exercises of law enforcement power.

The use of masks and other tactics that obscure official identity carries historical and semiotic weight. Authoritarian regimes have used masked security forces to intimidate and control

---

[15] 6 U.S.C. § 111.

[16] *See Juan T.R. v. Noem*, No. 26-cv-01077 (PJS/DLM), 2026 WL 232015, at *1 (D. Minn. Jan 28, 2026) ("Attached to this order is an appendix that identifies 96 court orders that ICE has violated in 74 cases. The extent of ICE's noncompliance is almost certainly substantially understated.").

[17] The Seventh Circuit held that defendant officers acted reasonably under the Fourth Amendment when they failed to identify themselves as police officers because they believed they were confronting an "armed and dangerous felon who had announced his intention to flee or fight rather than be arrested." *Caitlin v. City of Wheaton*, 574 F.3d 361, 366 (7th Cir. 2009).

populations. In this nation's history, the Ku Klux Klan relied on masks to terrorize victims while concealing accountability.[18]

With this background in mind, the ICE tactics of anonymous enforcement in this case contravene the history, purpose, and modern interpretation of the Fourth Amendment.

### 4.  Historical Context of the Fourth Amendment

The history of the Fourth Amendment confirms that the type of anonymized and indiscernible policing presented here is precisely what the Fourth Amendment was written to prevent. Proposed during the First Congress and ratified on December 15, 1791, the Fourth Amendment emerged directly from the Founding generation's experience with abusive search and seizure practices under British rule.[19] It was shaped by widespread colonial outrage[20] over the use of general warrants and writs of assistance, blanket authorizations that allowed British officials to conduct sweeping, suspicionless searches without constraint or attribution. *Carpenter v. United States*, 585 U.S. 296, 303 (2018).[21]

---

[18] Brandon Marc Draper, *Masq-or-Raid: Why Concealing Cops' Identities Creates Reasonable Doubt When Cops Are Victims*, 104 Tex. L. Rev. Online 155, 160 (2025).

[19] *See* Barry Friedman & Orin Kerr, *Common Interpretation: The Fourth Amendment*, Constitution Center, https://constitutioncenter.org/interactive-constitution/amendments/amendment-iv (last visited February 19, 2026) (stating that the Fourth Amendment was born out of concern of the impact of general warrants, which allowed the Crown's messengers to search for evidence of a crime without any limitations under English Law); Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 576–90 (1999) (cataloging the various interpretations of the Fourth Amendment in light of the Framers' goal to "prevent unjustified searches and arrests" and provide "a preventative strategy by consistently prohibiting even the issuance of a too-loose warrant"); Tracey Maclin, *The Central Meaning of the Fourth Amendment*, 35 Wm. & Mary L. Rev. 197, 213 (1993) ("There is universal agreement that these law enforcement tools were the specific evils the framers intended to condemn through the Fourth Amendment."). *See also Carpenter v. United States*, 585 U.S. 296, 305 (2018) (recognizing that the Fourth Amendment was adopted to "place obstacles in the way of a too permeating police surveillance" and secure "the privacies of life against arbitrary power") (citation modified).

[20] "In fact, as John Adams recalled, the patriot James Otis's 1761 speech condemning writs of assistance was 'the first act of opposition to the arbitrary claims of Great Britain' and helped spark the Revolution itself." *Carpenter*, 585 U.S. at 303–04 (quoting *Riley v. California*, 573 U.S. 373, 403 (2014)).

[21] This outrage culminated in three landmark cases that laid the groundwork for the Founders' rejection of general warrants: *Entick v Carrington*, 19 How St Tr 1029 (CP 1765); *Wilkes v Wood*, 19 How St Tr 1153 (CP 1763); and *Leach v Money*, 19 How St Tr 1001 (KB 1765). *See* Laura K. Donohue, *The Original Fourth Amendment*, 83 U.

Against this backdrop, the Framers sought to erect firm constitutional barriers against unchecked government power. A central aim of the Fourth Amendment was, as the Supreme Court later observed, "to place obstacles in the way of a too permeating police surveillance." *United States v. Di Re*, 332 U.S. 581, 595 (1948). The Amendment's text embodies this objective by conditioning searches and seizures on reasonableness and by requiring that warrants issue only upon probable cause, supported by oath or affirmation, and with particularized descriptions of the places to be searched and the persons or things to be seized. U.S. Const. amend. IV.

While rooted in eighteenth-century abuses, the Fourth Amendment has proven adaptable to evolving forms of governmental intrusion. *See, e.g.*, *Kyllo v. United States,* 533 U.S. 27, 34 (2001) (holding that, absent a warrant, the government may not use new sense-enhancing technology to explore the interior of a home); *Riley v. California*, 573 U.S. 373, 401 (2014) (holding that police officers must generally obtain a warrant before searching the contents of a cell phone); *Carpenter*, 585 U.S. at 320 (holding that the government must generally obtain a warrant before acquiring cell-site location information from a wireless carrier). Although historically tied to property,[22] the Supreme Court has recognized that "property rights are not the sole measure of Fourth Amendment violations." *Soldal v. Cook County,* 506 U.S. 56, 64 (1992).

The modern era of Fourth Amendment jurisprudence began in 1967 with *Katz v. United States*, 389 U.S. 347 (1967), which reframed the Amendment's protections around "reasonable expectations of privacy" rather than rigid property concepts. There, the Supreme Court established

---

Chi L. Rev. 1181, 1196–1207 (2016). In these cases, the courts held that executive officers lacked statutory or common-law authority to issue or execute general warrants authorizing the arrest of unnamed persons and the sweeping search and seizure of private papers, establishing that such indiscriminate intrusions constituted trespass and violated fundamental protections of property and liberty. *See id.* at 1196–2016.

[22] For much of its history, the Fourth Amendment was "'tied to common-law trespass' and focused on whether the Government 'obtains information by physically intruding on a constitutionally protected area.'" *Carpenter*, 585 U.S. at 304 (quoting *United States v. Jones*, 565 U.S. 400, 405, 406 n.3 (2012)).

that "the Fourth Amendment protects people, not places." *Id.* at 351. In the decades since, the Supreme Court has used this approach to build a grand edifice of Fourth Amendment doctrine, interpreting the Amendment as securing the right of individuals "to personal security and privacy," free of "arbitrary and abusive" governmental interference. *Brown v. Texas*, 443 U.S. 47, 52 (1979).

The Fourth Amendment's enduring purpose of restraining arbitrary power governs searches, seizures, and identification demands across both criminal and civil contexts, including immigration enforcement. *See, e.g.*, *Torres v. Madrid*, 592 U.S. 306, 321 (2021); *Grady v. North Carolina*, 575 U.S. 306, 307–11 (2015) (holding that a civil program that used GPS ankle bracelets to monitor recidivist sex offenders was a violation of the Fourth Amendment and constituted a search); *INS v. Delgado*, 466 U.S. 210, 216 (1984) (explaining that absent a reasonable suspicion of misconduct, detaining an individual to determine his identity when the individual refuses to show his identification violates the Fourth Amendment); *Brown v. Texas*, 443 U.S. 47, 50 (1979) ("[W]hen the officers detained [defendant] for the purpose of requiring him to identify himself, they performed a 'seizure' of his person subject to the requirements of the Fourth Amendment.").

Though the precise contours of a noncitizen's Fourth Amendment protections remain unsettled, the Supreme Court has recognized that the Amendment extends to noncitizens who have "substantial connections" to the United States. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 272–73 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 881–82 (1975) ("For the same reasons that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens."); *INS v. Lopez-*

*Mendoza*, 468 U.S. 1032, 1046 (1984) (assuming, without deciding, that the Fourth Amendment applied to illegal aliens in the United States and stressing the importance of "Fourth Amendment rights of all persons").[23] Several circuit courts have similarly recognized or assumed that the Fourth Amendment applies to noncitizens and citizens alike. *Cotzojay v. Holder*, 725 F.3d 172, 181 (2d Cir. 2013) ("[I]t is uncontroversial that the Fourth Amendment applies to aliens and citizens alike."); *Carcamo v. Holder*, 713 F.3d 916, 921 (8th Cir. 2013) ("We have observed that the Fourth Amendment, which protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,' applies as much to illegal aliens inside this country as it does to citizens."); *see also United States v. Murillo-Lopez*, 151 F.4th 584, 589–90 (4th Cir. 2025) (addressing noncitizens' Fourth Amendment challenge to stop).[24]

There can be no doubt that the Petitioner has substantial connections to the country and enjoys rights guaranteed by the Fourth Amendment. He arrived in the United States as a minor and has lived here for the past four years. He holds lawful work authorization and possesses a valid driver's license.

The doctrinal uncertainty, however, when coupled with expansive enforcement authority, risks undermining the Framers' original objective by chilling the exercise of constitutional

---

[23] The Supreme Court has delineated the scope of other constitutional rights afforded to noncitizens. *See, e.g., Plyler v. Doe*, 457 U.S. 202, 211–212 (1982) (illegal aliens protected by Equal Protection Clause); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953) (resident alien is a "person" within the meaning of the Fifth Amendment); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (resident aliens have First Amendment rights); *Russian Volunteer Fleet v. United States*, 282 U.S. 481 (1931) (Just Compensation Clause of Fifth Amendment); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (resident aliens entitled to Fifth and Sixth Amendment rights); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (Fourteenth Amendment protects resident aliens).

[24] The Supreme Court has long recognized a border-search exception to the Fourth Amendment's warrant requirement. In *United States v. Flores-Montano*, the Court looked to the nation's sovereign "interest in protecting . . . its territorial integrity" to justify such searches. *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004). In *United States v. Montoya de Hernandez*, the Court stated, somewhat more narrowly, that Congress is the source of the executive's power. It explained that "[s]ince the founding of our Republic . . . [Congress has] granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985).

freedoms among vulnerable populations. Noncitizens may hesitate to assert their rights out of fear of government retaliation. In practice, undocumented immigrants may endure unreasonable searches and seizures rather than risk asserting Fourth Amendment protections that may or may not apply. In this way, the Fourth Amendment, intended by the Founders as a shield for individual liberty, is turned into a sword.

Congress frequently enacts laws in hopes of regulating immigration, creating "rules that would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976). Yet, as Justice Stevens emphasized, "even one whose presence in this country is unlawful, involuntary, or transitory is entitled to . . . constitutional protection." *Id.* at 77.

From its origins in resistance to colonial overreach to its modern application in an era of advanced surveillance and expansive enforcement regimes, the Fourth Amendment reflects a continuous historical effort to ensure that governmental power is exercised within defined constitutional limits.

The Founders recognized that freedom is imperiled not only when government actions lack legal justification, but also when those actions are carried out by agents whose authority is unchecked and whose actions cannot be traced. In this light, a warrantless, anonymous civil seizure like the one at issue here is merely a general warrant in modern dress. Masking and anonymization of officers, therefore, are fundamentally inconsistent with the historical understanding of the Fourth Amendment.

After considering the history of the Amendment, one need only look to the actual text. The Fourth Amendment guarantees the people the right "to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. ICE masking in this case clearly

violates both the Petitioner's right to be secure and his right against unreasonable searches and seizures.

### 5.  Security Guaranteed by the Fourth Amendment

"[T]he Fourth Amendment preserves personal security with respect to methods of apprehension old and new." *Torres*, 592 U.S. at 317, 324 ("[T]he *text* of the Fourth Amendment expressly guarantees the 'right of the people to be *secure* in their *persons*," and our earliest precedents recognized privacy as the 'essence" of the Amendment . . . ."). At its core, it prohibits "arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *Martinez-Fuerte*, 428 U.S. at 554. The conduct of ICE in this case does not survive constitutional muster pursuant to these standards.

Security is not simply freedom from unjustified intrusion. It describes a condition of living wherein one lives under law rather than arbitrary or oppressive power. And living under the law includes possessing a practical means to insist on rights while retaining the ability to hold government actors accountable for abuse. Fourth Amendment law is premised on a very basic assumption: that individuals know they are dealing with a legitimate law enforcement officer acting under the color of law when they are being seized.

When officers can wear a mask, fail to verify their credentials, refuse to disclose their name, arrive in an unmarked vehicle, and neglect to provide a justification for their seizure of an individual, the constitutional protection that the Framers envisioned has not just been corroded—it has been eviscerated.

But the People, protected by the Constitution, are not without recourse. The ability to seek redress is inseparable from the right to be secure.[25] One's right to be secure in their person protects

---

[25] Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 576 (1999) (The Framers had redress in mind as they "sought to prevent unjustified searches and arrests from occurring, not merely to provide

not only against interference but also ensures the practical ability to challenge unlawful intrusion. When officers can conceal their identity, the system effectively collapses. Individuals lack the information necessary to report misconduct for meaningful judicial review or internal investigation. Officers are thereby emboldened to exercise their power in an arbitrary and oppressive manner. And public trust is decimated.

There is practical danger as well. When masked individuals in unmarked vehicles seize someone on the highway, nothing visible distinguishes lawful enforcement from kidnapping. Federal regulations recognize as much, requiring agents to identify themselves when "practical and safe" to do so. 8 C.F.R. § 287.8(c)(2)(iii); *see also* 42 U.S.C. § 14141. The consequences of abandoning this requirement are well documented: in Florida, a man posed as an ICE agent to coerce immigrants into providing identification, and in North Carolina, an individual committed sexual assault under the guise of immigration enforcement.[26] These incidents have generated

---

an after-the-fact remedy for unjustified intrusions."); *see also id.* at 701 ("[T]he evidence suggests that [the Framers] would have expected, at a minimum, that courts would decline to enforce legislation that conflicted with the essential rights announced in the Constitution."). Consider the judicially crafted remedy of exclusion for Fourth Amendment violations. *Davis v. United States*, 564 U.S. 229, 236 (2011) (The exclusionary rule—suppressing evidence obtained in violation of the Fourth Amendment—is a "prudential doctrine" to "compel respect for the constitutional guaranty" (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)). And in Article III standing analysis, redressability is a prerequisite to jurisdiction. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). In *Christopher v. Harbury*, 536 U.S. 403, 412 (2002), the Court found that a due process "access to courts" claim exists when 1) the government deliberately conceals information, 2) which renders the plaintiff's underlying cause of action impossible, and 3) the loss is irreparable because the opportunity to sue is now gone.

[26] Peter D'Abrosca, *Florida man impersonates ICE agent, threatens to deport 2 men, police say*, Fox News (Apr. 7, 2025 at 12:11 PM EDT), https://www.foxnews.com/us/florida-man-impersonates-ice-agent-threatens-deport-2-men-police-say?msockid=330899fd96e06c4f2d958cb6978a6dc6 (Police arrested a Florida man who posed as an ICE agent, demanded identification of two individuals, and threatened to deport them.); Luke Tucker, *Man accused of impersonating ICE officer, sexually assaulting woman at Raleigh motel*, WBTV (Jan. 29, 2025 at 7:22 AM EST), https://www.wbtv.com/2025/01/29/man-accused-impersonating-ice-officer-sexually-assaulting-woman-raleigh-motel/ (A North Carolina man was arrested after he allegedly "entered the motel and threatened to deport the woman if she did not have sex with him" after telling her he was "sworn law-enforcement" and showing "her a business card with a badge on it."). *See also* Jose Olivares, *US sees spate of arrests of civilians impersonating Ice officers*, The Guardian (June 28, 2025 at 5:14 PM EDT), https://www.theguardian.com/us-news/2025/jun/28/civilians-impersonating-ice-officers (recounting instances of civilians impersonating ICE officers to enter property, assault people, and question members of the public); Artemis Moshtaghian, Gloria Pazmino, and Nick Valencia, *Multiple ICE impersonation arrests made during nationwide immigration crackdown*, CNN (Feb. 5, 2025 at 1:35 PM EST), https://www.cnn.com/2025/02/04/us/ice-impersonators-on-the-rise-arrests-made-as-authorities-issue-national-warning (describing impersonations in South Carolina, Pennsylvania, and North Carolina); Sam Levin, *The alarming*

widespread fear within immigrant communities, affecting routine activities such as sending children to school, grocery shopping, and attending recreational events.[27]

Validating law enforcement conduct that invites impersonation and undermines public trust would contaminate Fourth Amendment principles. As we have seen, when officers are faceless and nameless, others can exploit that anonymity for personal gain or criminal acts. This approach poses a serious public safety risk, endangers personal security, and increases the danger of law enforcement work—because the public cannot distinguish officials from imposters. Individuals understandably refuse to cooperate when they cannot tell the difference between a government agent and a criminal actor. This is precisely the kind of insecurity the Framers sought to prevent when they enshrined personal security in the Fourth Amendment.

### 6.  The Fourth Amendment's "Reasonableness" Requirement

The Fourth Amendment also promises that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV (emphasis added). The "basic purpose of this Amendment, as recognized in countless decisions of [the Supreme Court], is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Muni. Ct.*

---

*rise of US officers hiding behind masks: 'A police state'*, The Guardian (June 25, 2025 at 8:00 AM EDT), https://www.theguardian.com/us-news/2025/jun/25/immigration-officers-wearing-masks ("when real agents use masks more frequently, it becomes easier for imposters to operate"); Rebecca Beitsch, *FBI urges ICE to ID themselves as criminals impersonate officers*, MSN (Nov. 5, 2025) https://www.msn.com/en-us/news/us/fbi-urges-ice-to-id-themselves-as-criminals-impersonate-officers/ar-AA1PS17G (In response to "a string of cases in which those impersonating U.S. [ICE] officers committed crimes, such as kidnapping and assault," the FBI warned that individuals are targeting vulnerable communities and committing criminal activity by impersonating federal officers.).

[27] Jake Offenhartz, *Hard hats and dummy plates: Reports of ICE ruses add to fears in Minnesota*, AP News (Feb. 8, 2026 at 12:08 AM EST), https://apnews.com/article/immigration-ice-agents-minneapolis-ruse-54ca86155182edceeda68e649b5518f7 (describing "heightened fears" of plain clothes immigration enforcement amid the administration's "dramatic reshaping of immigration enforcement tactics nationwide"); Meg Anderson, *The ICE surge is fueling fear and anxiety among Twin Cities children*, NPR (Jan. 22, 2026 at 4:01 AM EST), https://www.npr.org/2026/01/22/nx-s1-5676035/minneapolis-ice-fear-anxiety-children (describing the isolation and fear of immigrants and citizens alike).

*of City and Cnty. of S. F.*, 387 U.S. 523, 528 (1967). In light of this broad constitutional guarantee, jurists have struggled over how to apply the Fourth Amendment to myriad federal action.[28] Modern interpretation has developed an unspoken tendency to treat reasonableness as synonymous with process—that is, to assume that the people's "right to be secure" is preserved as long as government agents follow judicially crafted procedures.[29] The problem is this: proceduralizing the Fourth Amendment shortens its reach.[30]

The Amendment protects far more than mere adherence to procedural rules. Its prohibition on unreasonable searches and seizures carries substantive meaning that exists prior to and independent of any procedural test.[31] The Constitution does not define "unreasonable," but neither

---

[28] *Camara v. Muni. Ct. of City and Cnty of S. F*, 387 U.S. 523, 528 (1967) ("Though there has been general agreement as to the fundamental purpose of the Fourth Amendment, translation of the abstract prohibition against 'unreasonable searches and seizures' into workable guidelines for the decision of particular cases is a difficult task which has for many years divided the members of this Court.").

[29] *Lange v. California*, 594 U.S. 295, 301–02 (2021) (reciting the Court's various "exigent circumstances" exceptions to the Fourth Amendment's warrant requirement); *Birchfield v. North Dakota*, 579 U.S. 438, 476 (2016) ("[A] breath test, but not a blood test, may be administered as a search incident to a lawful arrest for drunk driving."); *Florida v. Wells*, 495 U.S. 1, 4 (1990) (Warrantless inventory searches must be regulated by "standardized criteria" or "established routine."); *Georgia v. Randolph*, 547 U.S. 103, 120 (2006) (An occupant of a residence can consent to a warrantless search, but a warrantless search of a residence is unreasonable if a second resident, physically present, expressly refuses to consent.); *Caniglia v. Strom*, 593 U.S. 194, 199 (2021) (The Court reaffirmed a constitutional difference between what is reasonable regarding vehicles versus homes, and it has interpreted differing protections of each.).

[30] To be sure, this practice creates reliable administrability and provides notice to the public in an increasingly polarized and technological world. *See Lange*, 594 U.S. at 302 (Due to the "nature of emergencies," the Court reviews exigent circumstances challenges on a "case-by-case basis." (quoting *Birchfield v. North Dakota*, 579 U.S. 438, 457 (2016)). *See also Carpenter v. United States*, 585 U.S. 296, 309 (2018) (Applying the Fourth Amendment to the "new phenomenon" of being able to "chronicle a person's past movements through the record of his cell phone signals") *and Riley*, 573 U.S. at 403 ("The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought.") (2014); *but see Gonzalez v. United States*, 604 U.S. ---, 145 S.Ct. 529, 532 (2025) ("As explained, however, this Court has said that the Fourth Amendment must at minimum provide those protections that the common law guaranteed.") (denying cert petition).

[31] The Court observed that

> The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances.

*Terry v. Ohio*, 392 U.S. 1, 21 (1968).

is reasonableness exhausted by the requirement of a warrant and probable cause. While the Supreme Court has attempted to fit reasonableness into a warrant-and-exception framework, the prohibition on "unreasonable searches and seizures" does independent constitutional work. *See Kentucky v. King*, 563 U.S. 452, 459 (2011).

Indeed, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Courts are well acquainted with the reasonableness inquiry. The Supreme Court has repeatedly held that even when a search or seizure is otherwise justified, the Fourth Amendment still governs the manner in which it is carried out. *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) ("[I]t is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out."). The Court has, for example, imposed limits on the *reasonable* force officers may use, on the *reasonable* methods for stopping and seizing a moving vehicle, and on the *reasonable* ways to enter a residence.[32]

Therefore, "reasonableness" is the proper inquiry to consider the consistent masking of federal ICE agents. Fourth Amendment reasonableness considers the totality of the circumstances. *Barnes*, 605 U.S. at 80. "There is no 'easy-to-apply legal test' or 'on/off switch' in this context."

---

[32] *Barnes v. Felix*, 605 U.S. 73, 79 (2025) (the question was whether the force deployed was justified from the perspective of a reasonable officer on the scene); *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (officers acted reasonably "in using deadly force" to end a high speed car chase that lasted nearly five minutes); *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable."); *Graham v. Connor*, 490 U.S. 386, 395 (holding that all officer excessive force claims should be analyzed under the Fourth Amendment and its "reasonableness" standard); *Scott v. Harris*, 550 U.S. 372, 381 (2007) (holding that an officer acted reasonably when he rammed his car bumper into another's vehicle to terminate a chase and seize the individual); *United States v. Sharpe*, 470 U.S. 675, 688 (1985) (holding that a "20-minute stop is [not] unreasonable when the police have acted diligently and a suspect's actions contribute to the added delay"); *Terry*, 392 U.S. at 27 (permitting officers to conduct a "reasonable search for weapons" where there is "reason to believe that [they are] dealing with an armed and dangerous individual" regardless of probable cause); *Case v. Montana*, 607 U.S. ---, 146 S. Ct. 500, 508 (2026) (reaffirming *Brigham City*'s holding that an "officer may enter a home without a warrant if he has 'an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury.'" (quoting 547 U.S. at 400)); *United States v. Banks*, 540 U.S. 31, 38–42 (2003) (applying a reasonableness analysis to the amount of time officers must wait between knocking and entering a residence); *United States v. Ramierz*, 523 U.S. 65, 71–72 (1998) (The manner in which officers entered a home—by breaking a single window in a garage—was reasonable.).

*Id.* (citing *Scott*, 550 U.S. at 382–83). Yet, the assessment "takes into account . . . 'the whole picture.'" *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). In many circumstances, "it is generally not reasonable for a plainclothes officer to fail to identify himself when conducting a stop." *Doornbos*, 868 F.3d at 583; *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991). The totality of the circumstances justifying a failure to identify as law enforcement is narrowed to those instances "where the act of [identification] could itself reasonably be thought to have made the situation more dangerous" based on specific—not speculative—knowledge of danger. *Doornbos*, 868 F.3d at 583–86 (citing *Catlin v. City of Wheaton*, 574 F.3d 361, 365–68). "Absent reasonable grounds to think that identification would present an *unusual danger*, it is generally not a reasonable tactic" to fail to identify. *Id.* at 584 (emphasis added).

Here, Petitioner asks the court to assess whether the manner of his seizure was reasonable, and this analysis is guided by the totality of the circumstances. The Fourth Amendment requires that authority be visible, attributable, and recognizable at the moment it is exercised. Immigration enforcement is distinguishable from the *Doornbos* officer in a material way: we are not merely dealing with a plainclothes officer who fails to self-identify—we are dealing with groups of masked individuals arriving in unmarked vehicles, without badges or a means of discerning who they are. They are the problem that the court in *Doornbos* foreshadowed: a presence indistinguishable from lawbreakers. 868 F.3d at 585.

### 7.  The Government's Justification Does Not Withstand Scrutiny

This court does not hold that government authority must always be announced in advance or that concealment is never permissible. There are genuine exigencies the Constitution accommodates. An undercover officer infiltrating a criminal organization cannot reveal his identity

without destroying the investigation and endangering his life. An agent serving a warrant on an armed and dangerous suspect may have specific, articulable reasons for temporary concealment. In such cases the concealment is particularized, temporary, and subject to subsequent accountability. The undercover officer eventually testifies under his own name. The warrant is returned to the magistrate. The operation is subject to review. Accountability is deferred in those cases, not abandoned.

That is the critical distinction. What justifies concealment in genuine exigencies is that it is exceptional. Stops without identification must remain rare exceptions, not routine practice. *Doornbos*, 868 F.3d at 584 (permitting plainclothes officers to initiate stops without identifying themselves "must remain a rare exception, not the rule"). Anonymous policing "provokes panic and hostility from confused civilians who have no way of knowing that the stranger who seeks to detain them is an officer." *Doornbos*, 868 F.3d at 584. "Self-defense is a basic right," *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010), "and many civilians who would peaceably comply with a police officer's order will understandably be ready to resist or flee when accosted—let alone grabbed—by an unidentified person who is not in a police officer's uniform." *Doornbos*, 868 F.3d at 585.

What is happening here bears no resemblance to those recognized exceptions. This is not an undercover operation. No specific danger has been identified that required these agents to be masked for this arrest. This is a deliberate choice to conduct routine civil immigration enforcement through masked anonymous agents operating without warrants across the interior of the United States.

When concealment becomes policy rather than exception, the government has not invoked an exigency. It has abolished the rule that exigency was meant to qualify.

What is left after considering the narrow and exceptional circumstances where officer anonymity may be appropriate? The Government's justification for ICE officer masking—safety. The court has examined that justification carefully and finds it insufficient.

A mask does not stop a bullet. It does not deflect a blow. It provides no physical protection that the tactical equipment these officers already carry does not provide. A mask does one thing: it hides the face of the officer wearing it. On a public highway, in a civil arrest of a person suspected of no crime, the only purpose served by hiding an officer's face is to prevent his identification. And preventing identification serves only to eliminate accountability.

A law enforcement practice whose sole operational effect is the elimination of accountability is not a safety measure. It is a constitutional deficiency wearing the name of one.

The point runs much deeper than the inadequacy of the government's justification. Every public official who exercises coercive power assumes some personal exposure as the price of legitimate authority. Judges sentence. Prosecutors accuse. Officers seize. None is entitled to anonymity as a default condition of exercising state force.

The officer who arrests a person stands in no different constitutional position than the judge who sentences him or the prosecutor who sought the conviction. All exercise delegated authority. All do so under their own names and in their own persons, because accountability is not a burden imposed on public officials as a matter of grace. It is the structural condition of their authority. Remove it and what remains is not law enforcement. It is force without a face, which is another name for the thing the Fourth Amendment was written to prevent.

Judge Young, federal district court judge for the District of Massachusetts, recently observed:

> And there's the issue of **masks**. This Court has listened carefully to the reasons given . . . for masking-up and has heard the same reasons advanced by the defendant

> Todd Lyons, Acting Director of ICE. It rejects this testimony as disingenuous, squalid and dishonorable. ICE goes masked for a single reason -- to terrorize Americans into quiescence. Small wonder ICE often seems to need our respected military to guard them as they go about implementing our immigration laws. It should be noted that our troops do not ordinarily wear masks. Can you imagine a masked marine? It is a matter of honor -- and honor still matters. To us, masks are associated with cowardly desperados and the despised Ku Klux Klan. In all our history we have never tolerated an armed masked secret police. Carrying on in this fashion, ICE brings indelible obloquy to this administration and everyone who works in it.

*Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 174 (D. Mass. 2025) (emphasis added). The District Court for the District of Columbia has similarly found the Government's justification for masking unpersuasive, calling transparency in law enforcement a "matter of honor." *Escobar Molina v. DHS*, --- F. Supp. 3d ---, 2025 WL 3465518, at *37 (D.D.C. 2025) ("Requiring defendants to put pen to paper and explain who made each arrest and why constitutes the bare minimum to ensure defendants are compliant with the Constitution, the INA, and this Court's order, given the blatant misstatements about the INA's requirements for such arrests repeatedly espoused by DHS high-ranking officials.").

The constitutional rule this court applies is not that masks are categorically forbidden. The rule is that a practice whose sole operational effect is the elimination of accountability, deployed as routine civil enforcement without warrant or articulable exigency, is unreasonable under the Fourth Amendment.

In this case, masking combined with unmarked vehicles, absence of identification, absence of any warrant, and no post-seizure mechanism for attribution is that practice. The conclusion follows from the premise without any categorical leap.

Absent genuine, particularized necessity, the Fourth Amendment's reasonableness requirement prohibits government officers from executing a civil arrest while systematically

concealing their identities in a manner that eliminates contemporaneous and subsequent accountability.

The Petitioner cannot identify the agents who seized him. He knows the seizure occurred at a particular place and time, but he cannot name the individuals, attribute their conduct, or identify who used force, who made statements, or who violated what procedure. The seizure is functionally unanswerable. That is not a procedural gap. It is the elimination of constitutional accountability itself.

Masking during arrests is therefore not a neutral safety measure; it is a deliberate choice that transforms the nature of the seizure from lawful authority into anonymous coercion. As a matter of constitutional law, the Fourth Amendment does not permit this transformation absent genuine, particularized necessity. The Amendment's reasonableness requirement mandates that government officers identify themselves during arrests to ensure that seizures are perceived as lawful at the moment they occur, thereby preserving the balance between state authority and individual liberty.

### C.  The Fifth Amendment

#### 1.  Petitioner is Detained Under 8 U.S.C. § 1226(a)

I have previously addressed at length which statutory framework governs detention of persons arrested in the interior of the United States. *See Aroca v. Mason*, No. 2:26-cv-00057, --- F. Supp. 3d ---, 2026 WL 357872, at *11–*20 (S.D. W. Va. Feb. 9, 2026). As this court has held, and as nearly every district court to examine the question has concluded, 8 U.S.C. § 1225(b)(2)(A) does not apply to noncitizens arrested in the interior of the country who are not *seeking admission*. Noncitizens already present in the United States are governed by 8 U.S.C. § 1226(a), which provides for discretionary detention and requires individualized custody determinations. Applying

that analysis here, the Petitioner's continued detention lacks statutory authority. As in *Aroca*, "[n]othing in the record suggests [Petitioner was] actively seeking admission at the time of [his] arrest." *Aroca*, 2026 WL 357872 at *17. The record reflects that Petitioner entered the United States as an unaccompanied minor in 2022, has since resided here, obtained a work permit, and was in the asylum process.  Those facts are inconsistent with treatment as an applicant seeking admission under § 1225(b)(2)(A).[33]

### 2.  Petitioner's Due Process Rights Were Violated

The Fifth Amendment's Due Process Clause independently requires the same result. As the Supreme Court has explained, "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. That protection is not limited to citizens.[34]  It extends to noncitizens, including those in removal proceedings. *Id.* at 693 ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *see also Reno v. Flores*, 507 U.S. 292, 306 (1993).

Due process is not satisfied by the existence of legal authority somewhere in the United States Code. It is satisfied only through constitutionally adequate procedure. The "essence of due process is the requirement that 'a person in jeopardy of serious loss be given notice of the case

---

[33] To the extent that Petitioner makes an argument pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232, I find that the court need not reach that argument because Petitioner is not subject to mandatory detention under § 1225 on different grounds. *See Chachipanta Cando v. Bondi*, No. 8:26CV46, 2026 WL 357551 (D. Neb. Feb. 9, 2026); *see also RARR v. Almodovar*, No. 25-CV-6597, 2026 WL 323040 (E.D.N.Y. Feb. 6, 2026). For similar reasons, I decline to address Petitioner's APA argument.

[34] "No *person* shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. (emphasis added); *Zadvydas*, 533 U.S. at 693 ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Indeed, we have clearly held that the Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government."); *Reno v. Flores*, 507 U.S. 292, 307 ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.").

against him and opportunity to meet it.'" *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring)). That requires, at minimum, notice, a meaningful opportunity to be heard, and adjudication by a neutral decisionmaker. Administrative convenience has never been a substitute for constitutional process. The Constitution does not yield to efficiency.

Here, Petitioner received none of what due process requires. He was seized without warrant, given no notice of the basis for his detention, and transported to a regional jail without any opportunity to be heard before a neutral decisionmaker. What the government offered instead was a fait accompli: seizure, transport, imprisonment, and the suggestion that review could be sought of a deprivation already complete, through mechanisms controlled by the detaining authority. That is not due process. It is the absence of it.

Petitioner's summary detention is particularly stark in light of the Government's own prior determination. Upon his initial arrest in February 2022, immigrations officers released Petitioner and permitted his entry on the basis that he was neither a danger to the community nor a flight risk. When he was re-arrested and detained this year, he received neither notice nor an opportunity to be heard as to whether a change in custody status was warranted.

Like the petitioners in *Larrazabal-Gonzalez* and *Aroca*, Petitioner is entitled to a bond hearing under § 1226(a) but has not received one, despite being detained since January 7, 2026. Such prolonged detention without an individualized bond determination violates due process under the balancing framework articulated in *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). *Aroca*, 2026 WL 357872 at *18–*20. Application of the *Mathews* factors confirms that the private interest at stake—physical liberty—is substantial; the risk of erroneous deprivation absent a bond hearing is significant; and the Government's interests are not unduly burdened by affording

constitutionally required process. As this court previously observed, "the Government has no legitimate interest in refusing to follow its own rules." *Id.* at *19. Furthermore, Petitioner has no criminal history or gang affiliations and has been living in the United States since he was a minor, substantially mitigating any asserted public-safety or flight-risk concerns.

"The issue here is not the permissibility of immigration detention, but rather the process required in connection with such detention." *Valdez v. Joyce*, 2025 WL 1707737, at *3 (S.D.N.Y. June 18, 2025). Treating the immigration process as "a game of detention roulette" is inconsistent with the constitutional guarantee of due process. *Lopez Benitez*, 795 F. Supp. 3d at 499. "[T]he government's discretion to incarcerate non-citizens is always constrained by the requirements of due process." *Hernandez*, 872 F.3d at 981, 990 n.17 (citing *Zadvydas*, 533 U.S. at 695). "A statutory violation is a failure to follow the law. A knowing constitutional violation is a refusal to be bound by it." *Aroca,* 2026 WL 357872, at *19.

### D. Remedy

Petitioner has met his burden of proving he is being held contrary to law. *Walker*, 312 U.S. at 286. He seeks the "typical remedy" for "unlawful executive detention," which "is, of course, release." *Munaf v. Geren*, 553 U.S. 674, 693 (2008). "[T]he traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). It is the "usual remedy by which a man is restored again to his liberty, if he ha[s] been against law deprived of it." *Id.* (internal citation omitted).

Accordingly, Petitioner's immediate release is warranted. *See Larrazabal-Gonzalez*, 2026 WL 221706, at *5 ("There is no process to await. The Constitution requires release."); *accord Quijada Cordoba v. Knight*, No. 1:25-CV-00605-BLW, 2025 WL 3228945, at *9 (D. Idaho Nov. 19, 2025) (collecting cases of "courts across the country [that] have ordered the immediate release

of detainees in similar situations" and ordering the release of a petitioner who challenged his detention without a bond hearing); *Yao v. Almodovar*, No. 25-CV-9982, 2025 WL 3653433, at *12 (S.D.N.Y. Dec. 17, 2025) (same); *Solano*, 2026 WL 311624, at *20–21 (same).

## IV.     CONCLUSION

An anonymous government is no government at all. It cannot be held accountable. A masked agent freely uses force without justifying his actions, and the public cannot name him to challenge his conduct.

A regime of secret policing has no place in our society. Here, the Government's power is derived by the People, and the People must be able to identify the Government when it acts to infringe on their liberty. Masks obscure government action and deprive the public of its Fourth Amendment protections.

Therefore, the Petition for Writ of Habeas Corpus, **[ECF No. 26],** is **GRANTED**. Petitioner is **ORDERED** released immediately from civil immigration custody. Respondents are **PROHIBITED** from re-arresting and detaining Petitioner absent significant change in circumstances to justify detention or subject to the determination of a neutral and detached decisionmaker.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel, any unrepresented party, and the United States Attorney's Office for the Southern District of West Virginia.

The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:          February 19, 2026

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

34